STATE OF WEST VIRGINIA *v.* C. L. LILLY

(No. 7125)

Submitted April 20, 1932.   Decided April 26, 1932.

232

*M. F. Matheny, A. D. Preston,* and *F. R. Hill,* for plaintiff in error.

*H. B. Lee* Attorney General, and *W. Elliott Nefflen,* Assistant Attorney General, for the State.

MAXWELL, JUDGE:

Sentenced to three years' imprisonment under conviction of grand larceny, defendant prosecutes this writ of error. There was a change of venue from Raleigh County to Pocahontas.

By statute a person who obtains money or other property by false pretense is guilty of larceny. 1923 Code, chapter 145, section 23; 1931 Code, 61-3-24. "Under a count for simple larceny it is admissible to prove that the property was obtained by false pretense, with intent to defraud." *State* v. *Williams,* 68 W. Va. 86, 69 S. E. 474. In conformity: *State* v. *Martin,* 103 W. Va. 446, 137 S. E. 885. The state's charge against Lilly is that he obtained money of L. N. Hedrick and his wife, Minnie A. Hedrick, by false pretense with intent to defraud, and is therefore guilty of larceny under the statute.

At the time of the transaction here involved, Neola B. Lytton resided in the vicinity of the city of Beckley on a six-acre tract of land of which she was presumably the owner. Defendant, a practicing attorney at Beckley, knew that there was several hundred dollars of indebtedness against the property, and that Mrs. Lytton's husband had just died from accident. At defendant's solicitation, she gave him a ten-day option on the property at the price of $3,000.00. She testifies that he advised her that she should sell the property

so as to discharge the indebtedness and have a few hundred dollars cash surplus.

Defendant had been a neighbor of Mr. and Mrs. Hedrick and was well acquainted with them. He knew that their daughter had just died leaving several thousand dollars of life insurance payable to them. At about the time of obtaining the option of Mrs. Lytton, defendant approached Mr. Hedrick and interested him in the purchase of the Lytton property. Mr. Hedrick went to see the property, and then, within a day or two the defendant took both Mr. Hedrick and his wife to inspect the property. On the return trip to Beckley in a taxi, Mr. Hedrick asked the defendant if there were "any heirs against the place" or debts or incumbrances. Defendant replied that there was certain lien indebtedness but that there were no heirs. After their return to Bckley Mr. and Mrs. Hedrick told defendant they would take the property at the price he had asked them for the same.

Defendant admits replying to Mr. Hedrick in the taxi that there were no heirs interested in the property but says he made that reply in good faith on information which he had received from both Mrs. Lytton and her husband and from recitals in a recorded deed. The truth was that there was then outstanding in the children of Clayton Lytton, deceased, an undivided one-fifth interest in this property. Clayton was a brother of Mrs. Lytton's husband. The property had been owned by their brother, J. F. Lytton, an unmarried man. Upon his death, title had been cast by descent upon his mother, Virginia McNabb, his three brothers, James E., W. G., D. L. (Neola B. Lytton's husband), and upon the children of Clayton Lytton, deceased. James E. and W. G. Lytton thereafter conveyed their interests to Mrs. McNabb, reciting in the deed that they were the only heirs of J. F. Lytton, deceased. Mrs. McNabb devised the property to D. L. Lytton. The latter and his wife, Neola, conveyed the property to Ruth Mahaney and she immediately reconveyed to Neola. In these transfers the Clayton Lytton interest was entirely ignored.

The price paid by Mr. and Mrs. Hedrick for the property was $5,250.00. Check for this amount was executed by Mr.

Hedrick payable to Neola B. Lytton. At a bank in Beckley where the transaction was closed, Mrs. Lytton endorsed her name on the back of the check apparently without knowing the amount thereof, and immediately turned it over to the defendant, who at once deposited it to his credit in the bank. He then drew his check to Mrs. Lytton for $3,000.00, and she immediately discharged the indebtedness against the property. Defendant's net profit was over $2,000.00.

Pursuant to an understanding which Mr. and Mrs. Hedrick had with the defendant at the time they agreed to purchase the property, they employed W. H. McGinnis, Jr., a lawyer at the Beckley bar, to examine the title. He did so and reported that so far as he could ascertain from the records, the title was all right, subject to the lien indebtedness. The defendant takes the position that the Hedricks thus having employed an attorney to examine the records for them, must be deemed to have relied upon his advice in the matter rather than upon any representations they claim the defendant made to them. This proposition cannot stand in the light of the undenied testimony of Mr. McGinnis that at the bank, just before the deed was delivered and the purchase money paid, he said to the defendant: "Charlie, are there any heirs against this property?"; and that to this inquiry the defendant replied, "There are no heirs." Mr. McGinnis further testifies that Mrs. Lytton then confirmed the defendant's negative reply. It may be noted at this point that Mrs. Lytton was also indicted for this offense, but that the indictment was dismissed because the prosecuting attorney said he thought he could not sustain the accusation.

There is the undenied testimony of another witness which goes far to discount the contention of the defendant that he acted in good faith. This witness was J. E. Hollandsworth, a merchant who had a store in the vicinity of the home of Neola B. Lytton. He testifies that he had heard that the sale of the Lytton property was to be closed on a certain day and that on that day he went to Beckley to collect from Mrs. Lytton out of the purchase money of the property the amount of the bill which he had against her for merchandise. He says that he went to the bank just as the parties were assem-

bling to close the transaction; that he spoke to the defendant and told him that he "had better have an administrator appointed and sell that property right, there is some infant heirs, and they had a lot of debts, so people will know who to turn their bills into." He says the defendant then asked him the amount of his indebtedness and upon being informed that it was $20.00, the defendant said to him: "Shut up, I'll see that you get your money."

Neola B. Lytton testifies that several times before the transaction was closed she mentioned to the defendant the matter of the heirs of Clayton Lytton, but that he insisted there were no heirs. Henry Sorrell and his wife who lived at the Lytton home both testify that they heard the Clayton Lytton heirs proposition discussed in conversation between Neola B. Lytton and the defendant.

The state's evidence was ample to warrant the jury in believing that the defendant knowingly misrepresented the matter of the title of the property to Mr. and Mrs. Hedrick for the purpose of defrauding them.

The defendant produced the testimony of two or three witnesses to the effect that while the transaction was pending they told Mr. Hedrick there were some heirs interested in the property. He denies this as well as the testimony of one Jennings who had stated that Mr. Hedrick told him the defendant had not made any misrepresentations about the title but that Mrs. Lytton had. These were all jury matters.

For the defendant it is urged that there is a fatal variance between the indictment and the proof; that, whereas the defendant is charged with the larceny of money of L. N. Hedrick and Minnie A. Hedrick, the proof shows the money which the defendant obtained did not then belong to the Hedricks, but had passed from them to Neola B. Lytton by virtue of the check given by the former to the latter. This is a refinement or nicety which, in our judgment, should not be controlling of this situation. We should not look to the involutions of the affair. The defendant's *modus operandi* is of only secondary importance. The essential inquiry is, did he obtain the money of the Hedricks by means of false pretense with intent to defraud? If it was his plan and design that the Hedricks

should be induced to part with their money, for his benefit, by reason of false representations made by him to them, that is the essence of the crime. And whether the money came from them directly to him or through another person is not at all material.

At the trial, objection was repeatedly made by the defendant to the testimony of witnesses with reference to the "heirs" interested in this property. The court made two express rulings on this matter. The first time, after overruling a motion to strike out all of the state's evidence, the court stated: "I sustain the motion as to all witnesses who have heretofore testified as to who the heirs of Clayton Lytton were. That is a question of law." The second time, the court said: "Gentlemen of the jury, as to who are the heirs of a person is a question of law for the court to pass upon. Witnesses may be permitted to testify who are the children, father, mother, sister and brother; testify as to the facts, but as to who are heirs is a question of law, and I have stricken from the jury in this case the evidence of witnesses as to who the heirs of persons are." It is the contention of defendant that by these rulings the court emasculated the state's case; that there was thereby taken from the "consideration of the jury, the very thing relied upon by the state to bring about a conviction, and without the proof of which a conviction cannot be sustained." We cannot share this interpretation. We think the court, in the rulings quoted, in effect said to the jury that it was proper for them to consider from the evidence whether there was such a man as Clayton Lytton; whether he was dead; whether he left children surviving him; but that whether they were heirs was a question of law to be determined by the court. In conformity with this ruling, the court told the jury, in substance, in state's instruction No. 1, that the children of Clayton Lytton, deceased, were heirs at law of his deceased brother, J. F. Lytton.

It is also insisted by the defendant that this prosecution cannot be sustained because it appears from the record that Mr. and Mrs. Hedrick have been in no wise disturbed or interfered with in their occupancy and enjoyment of the Lytton property upon which they entered soon after the

purchase. The fact that because of tolerance on the part of persons having an interest in the property Mr. and Mrs. Hedrick have suffered no disturbance of their possession cannot militate to the advantage of the defendant. We are unable to perceive that this is an element of the case. As already noted, the essence of the whole thing is, did the defendant obtain money of Mr. and Mrs. Hedrick by means of false pretenses? If he did, it makes no difference that other persons, whose rights have been ignored, have seen fit, thus far, not to assert those rights.

Two instructions were given on behalf of the state. A detailed discussion of them would protract to undue length this already long opinion. Suffice it to say that in our judgment they are both in accord with the principles of law controlling this case as discussed in this opinion.

Sixteen of the twenty-two instructions tendered by the defendant were given by the court to the jury. Careful examination of the rejected instructions discloses no error in their refusal.

Perceiving no prejudicial error in the record, we affirm the judgment.

*Affirmed.*